Filed 4/7/16  P. v. Young CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B264878 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA411151) |
| v. | |
| MICHAEL CLIFFORD YOUNG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig J. Mitchell, Judge.  Affirmed.

Law Office of David Carico and David D. Carico, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and John Yang, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Michael Young (defendant) of the murder of James Wilder and the attempted murder of Mauricio Flores. We are asked to decide if the trial court prejudicially erred in finding the defense's proposed expert witness on shooting incident reconstruction and vehicle identification unqualified to testify, while at the same time finding the prosecution's expert witness on vehicle identification qualified. We also consider claims of instructional error and prosecutorial misconduct.

## I. BACKGROUND

### A. *The Shooting*

Late in the evening on October 29, 2012, James Wilder and Mauricio Flores were shot in front of Flores's house by a man who drove up in an Infiniti vehicle. Wilder, a Black man, was hit four times; one shot was fatal. Flores, a Hispanic man, was grazed on his hip by a bullet. The shooting occurred in territory claimed by the 18th Street gang, which is primarily Hispanic. There was no evidence that either victim was a gang member.

Wilder's wife, Demetria Jackson-Wilder (Jackson), witnessed the shooting. The couple had driven from their home in the South Bay to mid-city Los Angeles to pick up Wilder's vehicle from Flores, who repaired vehicles from his home in the 2500 block of Spaulding Avenue. This block of Spaulding is narrow, and it lies between Adams on the south and 25th Street on the north. Viewed from Adams, however, Spaulding appears to be a dead end, truncated by the 10 Freeway.

Prior to the shooting, Flores noticed what he described as a white BMW drive past him going north on Spaulding. He also noticed a gray Infiniti drive past going north. The Infiniti made a U-turn and drove back towards Flores and Wilder. Jackson also noticed the Infiniti on its return because it almost sideswiped her Jeep. She described it as a metallic Infiniti SUV.

The Infiniti drove past Flores and Wilder and stopped. A man got out of the Infiniti and walked to its rear. He said something, and Wilder replied, "I don't know."

2

The man took out a gun and looked around. Flores said, "He's got a gun," and attempted to pull Wilder by his sweater to cover, but Wilder could not or did not move with Flores. The man with the gun fired twice. There was a pause, which Flores believed was caused by the gun jamming.

Jackson, who was sitting in the Jeep facing north, looked into the rear-view mirror, toward the shooting. She saw the back of a man who was pointing a gun at Flores and Wilder. She described the man with the gun as a short Black man with a medium build who may have been wearing braids. She characterized him as a "small guy." Jackson also noticed that a black Mercedes sedan or BMW was stopped near the north end of Spaulding, facing south toward her.

According to Flores, after the initial two shots, the shooter fired about eight more shots. Flores was able to reach his neighbor's car and hide behind it. The Infiniti left after the second round of shots, driving fast towards Adams. At Adams, the Infiniti turned right to go west. The Mercedes or BMW backed up and made a U-turn, hitting another car in the process.

Jackson got out of the Jeep and found her husband lying on his back on the ground. Armando Herrera came out of his house to help and called an ambulance. Herrera told police that he had heard gunshots, looked outside and saw a light-colored Infiniti SUV on Spaulding going towards Adams.

Wilder was taken by ambulance to a hospital, where he was pronounced dead. Autopsy results showed that Wilder died from a fatal gunshot wound to his back which penetrated his heart, spleen, and kidney. Wilder also suffered two non-fatal gunshot wounds and a graze wound.

*B.* *The 911 call and Subsequent Investigation*

Flores called 911 after the shooting. He told the operator that the Infiniti from which shots were fired was an Infiniti two-door coupe. Flores gave the same description to police several hours after the shooting, adding that it was a G35.[1]

Los Angeles Police Department Detective Paul Funicello obtained surveillance video footage from a furniture store on West Adams, a beauty shop on Adams, and a liquor store on Rodeo Road. The furniture store video shows a light-colored vehicle travelling in the direction of Spaulding Avenue about 9:57 p.m. The beauty shop and liquor store video footage shows a similar looking vehicle travelling west on Adams and east on Rodeo, and thus away from Spaulding, between 10:00 p.m. and 10:03 p.m. At trial, prosecution expert Stephen Ferrara testified the vehicle in the beauty shop and liquor store videos was an Infiniti FX SUV manufactured sometime after 2004.

Suspicion for the killing focused on the Black P Stone gang, which was a rival of the 18th Street gang. Detective Funicello learned that on October 21, 2012, about a week before the shootings in this case, Casey Salazar was shot in the head in territory claimed by the Black P Stone gang. The suspects were Hispanic.[2] He also learned that Salazar was defendant's cousin. Defendant is a member of the Black P Stone gang. A search of police databases revealed defendant occasionally drove an Infiniti FX which belonged to Nicole Plain, his girlfriend.

In April 2013, a search of Plain's residence uncovered ammunition, photographs of defendant and Plain, and an application and a traffic ticket bearing defendant's name. The traffic ticket showed that defendant was driving Plain's 2004 Infiniti FX 35. When

---

[1]  At the preliminary hearing, Flores similarly testified that the vehicle was a two-door Infiniti G35 coupe.

[2]  On October 30, 2012, police executed a search warrant at the home of an 18th Street gang member who was believed to store weapons for his fellow gang members. The police found a hidden 9 millimeter handgun. The parties stipulated that forensic analysis demonstrated the gun was the one that produced the casings found at the scene of the Salazar shooting.

shown a photo of Plain's Infiniti, Jackson stated that it appeared identical to the Infiniti SUV she saw on Spaulding Avenue.

Plain had an alibi for the time of the shooting. She was at work at a Ralph's supermarket in Pacific Palisades. Defendant drove her there in the Infiniti and dropped her off.

In May 2013, police searched an apartment on Gelber Place.[3] Defendant was in the apartment with Sheldia Ellerbe and her two sons. Police found six 9 millimeter rounds in a toilet in the apartment. Detective Funicello learned that Ellerbe drove a brown-gold Mercedes. There was collision damage to the rear bumper.

Police obtained cell tower data from Verizon for a phone number associated with defendant. Federal Bureau of Investigation Agent Michael Easter, a cellular analysis expert, examined the data. The data revealed that the cell phone assigned to the number associated with defendant used two towers in Pacific Palisades at 4:50 p.m. and 4:58 p.m. on October 29, 2012. At 9:54 p.m., the cell phone began a seven-minute call which ended using a tower on Washington Boulevard facing Spaulding Avenue. At 10:49 p.m. and 10:58 p.m., the cell phone again used two towers in Pacific Palisades.

### C.    Trial

At trial, Los Angeles Police Department Detective Brian Thayer testified as a gang expert for the prosecution. In response to a hypothetical question reflecting the facts of this case, Detective Thayer opined the shooting was committed for the benefit of, at the direction of, or in association with the Black P Stone gang. The shooting benefited the Black P Stone gang because it was committed in rival territory and aimed at suspected 18th Street gang members. The 18th Street gang did have a few Black members. Detective Thayer opined that if Hispanic males had previously shot a member of the

---

[3]    Detective Funicello connected a cell phone number provided by Plain with an address in the 4000 block of Gelber Place. He entered Plain's license plate number into the police department's License Plate Reader System and learned that the car had been photographed in the 4000 block of Gelber Place on October 28, 2012.

Black P Stone gang, the shooting in this case would be retaliation. It would also maintain respect and fear toward the Black P Stone gang.

Much of the defense evidence at trial focused on showing that the shooter's vehicle was an Infiniti G35 coupe, not an SUV. Valentin Martinez, a resident of Spaulding Avenue, testified that he looked out his window after hearing gunshots, and saw a silver two-door coupe which traveled in reverse northwards, made a turn, hit a car and drove away on 25th Street. Los Angeles Police Department Officer Peter Argueta testified he investigated a traffic collision at the intersection of 25th and Spaulding. Martinez told him the vehicle that caused the collision was a silver 2004 Infiniti G35. At trial, Flores waffled about whether the Infiniti was a coupe or a SUV. He implied his earlier identification was based on the sound of the exhaust, but that the G35 coupe and the FX SUV sounded the same and that after the shooting he came to believe that the shooter's car was more rounded, like the FX SUV. Alternate Public Defender Investigator Derek Kawai testified that Flores told him the shooter's vehicle was a coupe, possibly an Infiniti G35. Defense Investigator Julie Valencia obtained photographs of several vehicles which resembled an Infiniti FX, including a 2012 Nissan Rogue, a 2012 Lexus, and a Toyota Rav 4, and these photographs were admitted in evidence at trial.

The defense also pursued a third party culpability defense, based almost entirely on testimony from prosecution witnesses. The defense elicited testimony that, unbeknownst to Jackson, the car Flores worked on for Wilder was not registered to Wilder. Jackson also testified that her husband had had problems with someone at work. Jackson and Flores each testified that the other said Wilder was being followed, although both denied making the statement themselves. Defense Investigator Kawai testified that Flores told him the shooter took a couple of steps towards Wilder, who was lying on the ground after firing the first shots; the shooter then fired one or two more shots at Wilder. The defense argued that this showed a personal motive, not a gang-related motive, for the shooting.

Defendant sought to have an expert, Dr. Bruce Krell, testify on the identification of the vehicle shown in the surveillance videos and the position of the shooter when he

6

fired the fatal shot at Wilder. Krell enhanced the surveillance videos, and would have testified that the videos showed an Infiniti coupe, not an SUV. Krell also would have testified that, using Flores's description of the shooting and autopsy results, he had reconstructed the shooting and it was reasonable to infer that the shooter was standing directly over Wilder's prone body when he fired the fatal shot. The trial court excluded this testimony on the ground that Krell was not qualified to testify as an expert.

The jury convicted defendant of one count of second degree murder in violation of Penal Code section 187 and one count of attempted murder in violation of sections 187 and 664. The jury found the attempted murder was willful, deliberate, and premeditated. The jury found true the allegation defendant committed the crimes for the benefit of a criminal street gang within the meaning of Penal Code section 186.22, subdivision (b)(4) and also found true various firearm enhancement allegations, including the allegation that a principal discharged a firearm causing death within the meaning of Penal Code section 12022.53, subdivisions (d) and (e)(1). The trial court sentenced defendant to a total term of 80 years to life in state prison, consisting of 15 years to life for the murder conviction, plus 15 years to life for the attempted murder conviction, plus two 25-to-life enhancement terms pursuant to section 12022.53.

## II. DISCUSSION

Defendant contends the trial court abused its discretion in finding his proposed expert was not qualified to testify on shooting incident reconstruction, photograph and video enhancement, and vehicle comparisons. He asserts the exclusion of his proffered expert testimony violated his Sixth and Fourteenth Amendment rights to due process of law, to present a defense, and to a jury trial. Defendant further argues the trial court abused its discretion in finding that a prosecution witness was qualified to offer expert vehicle comparison testimony. He also combines these two expert testimony contentions of error into a third claim that alleges the trial court's rulings constituted unequal treatment that violated his constitutional right to due process. Apart from his arguments for reversal based on the court's expert testimony rulings, defendant also argues the

7

prosecutor committed misconduct during closing argument and the trial court erred in partially instructing the jury on the natural and probable consequences doctrine.

We hold the trial court did not commit prejudicial error when it excluded the testimony of defendant's proposed expert witness or when it admitted the testimony of the prosecution's expert on vehicle identification. Although the trial court did err in giving a partial instruction on the natural and probable consequences doctrine, the error was harmless because the prosecution did not rely on that doctrine. Finally, defendant forfeited his claim of prosecutorial misconduct by failing to object in the trial court. Since there could be satisfactory explanations for defense counsel's failure to object to the misconduct, defendant's related claim of ineffective assistance of counsel fails. We affirm the judgment of conviction.

### A. Defense Expert Witness – Shooting Incident Reconstruction

The trial court precluded defense witness Dr. Bruce Krell from testifying as an expert about his shooting incident reconstruction. Krell would have testified that based on Flores's pretrial statements and testimony, Krell believed that Wilder was flat on the ground when hit by the fatal shot. The coroner's report showed the angle of the fatal wound as 55 degrees. In Krell's opinion, the shooter would have had to be standing over Wilder when he fired the fatal shot.

#### 1. Applicable law

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (Evid. Code § 720, subd. (a).)

The trial court's determination of whether a witness qualifies as an expert is a matter of discretion that will not be disturbed absent a showing of manifest abuse.

8

(*People v. Jones* (2012) 54 Cal.4th 1, 57; *People v. DeHoyos* (2013) 57 Cal.4th 79, 128-129.)

### 2.    *Ruling*

After holding an Evidence Code section 402 hearing, the trial court ruled Krell was not qualified to testify as an expert.  The trial court explained its ruling as follows: "With respect to his proffered testimony as to the wound path, the court finds that there is insufficient foundation as to Dr. Krell's expertise in determining the likely position of the decedent at the time that he was shot.  This is based on the following factors that were deduced in the 402 hearing:

"First, Dr. Krell admitted that he had no expertise in the area of crime scene reconstruction; two, he indicated his entire analysis was based solely on mathematical calculations; three, he acknowledged that the text he relies on for guidance in this area, the Haag text, specifically stated that it is impossible to determine the position of the victim when shot based on wound analysis alone; four, the court finds that he arbitrarily discounted one eyewitness in favor of another, discounted the victim's wife's testimony in favor of Mr. Flores' testimony; five, he interpreted Mr. Flores' testimony in a decidedly subjective manner.  He equated 'fell down' as being in a prone position on the ground; and lastly, he acknowledged during the 402 hearing that he mismeasured the location of the exit wound.

"Consequently, based on all those enumerated deficiencies, the court finds that Dr. Krell simply is not an expert in the area of crime scene reconstruction that would be a predicate for him being able to testify as to the position of the decedent when shot.

"I should note for the record in its entirety the court found that Dr. Krell's science was subjective.  In fact, while it's not a terribly scientific word, I found that his science was sloppy at best, was contrary to the very text that he cited, that Dr. Krell's satisfaction of his foundational obligation to testify is not a close call by this court."

The court later added, "And I further needed to note, and I missed a very critical point, his whole approach to his obligation as an expert was most clearly revealed for its

9

deficiency with respect to his constructing an opinion as to the exit would of the fatal gunshot where he was given a definitive measurement in the autopsy report, and he mismeasured. [¶] I have to ask myself, how in the world can a mathematician be so horrendously imprecise?"

### 3. Analysis

It is true that Krell's opinion did depend in part on crediting one witness's testimony (Flores's) over another's (Jackson's). Krell did concede he made an error in transcribing a measurement from the autopsy report. And Krell also acknowledged that the Haag treatise indicated the path of a projectile (here, a bullet) may deviate as it passes through tissue, organs, and other structures such that wound path cannot reveal what a victim was doing or what position a victim was in seconds before the arrival of a bullet. These are facts that a court could rely on to doubt whether Krell's testimony was supported by a sound scientific basis.

On the other hand, one of the primary reasons on which the trial court relied to exclude the testimony was its observation that Krell was not qualified as an expert in the area of "crime scene reconstruction." The court emphasized this point after summarizing the five reasons quoted above, stating "based on all of those enumerated deficiencies, the court finds that Dr. Krell simply is not an expert in the area of crime scene reconstruction that would be a predicate to him being able to testify as to the position of the decedent when shot." This is correct, as Krell himself acknowledged, but Krell was not offered as an expert on crime scene reconstruction; he was offered as an expert on shooting incident reconstruction, a narrower field of expertise. Defendant's attorney made precisely this point in objecting to the court's oral ruling and she submitted a list of qualifications from the Haag treatise that she asserted were all satisfied by Krell's resume, a copy of which she also submitted. The court stated it would review the material carefully and revisit its decision if warranted, but the court at no time reconsidered its ruling, nor did it indicate it had previously misspoken and instead meant to rely on the witness's lack of expertise in *shooting incident* reconstruction.

10

Although the court acknowledged that there were differences in the two types of reconstruction expertise, the record contains no description of those differences, and the court did not explain in its ruling how or why a lack of expertise in crime scene reconstruction disqualifies a witness from being an expert in shooting incident reconstruction.[4] As we explain below, however, even if the lack of such an explanation could suggest an abuse of discretion, any error in excluding Krell's testimony was harmless.

An error in excluding expert testimony may be found harmless. (*People v. McDonald* (1984) 37 Cal.3d 351, 376, overruled on other grounds by *People v. Mendoza* (2000) 23 Cal.4th 896.) We examine the whole record to determine if there is a reasonable probability that defendant would have obtained a more favorable result in the absence of the error. (*Ibid.*, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

"'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)" (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) When "the trial court merely reject[s] some evidence concerning a defense, and [does] not preclude defendant from presenting a defense, any error is one of state law and is properly reviewed under *People v. Watson*, *supra*, 46 Cal.2d at page 836. (*People v. Fudge*, *supra*, at p. 1103.)" (*People v. McNeal*, *supra*, 46 Cal.4th at p. 1203.)

If a trial court's ruling does preclude a defendant from presenting a defense, we evaluate the error to determine whether it is harmless beyond a reasonable doubt.

---

4    Generally, speaking, crime scene reconstruction is a broad specialty that includes every aspect of the crime scene. (See, e.g., *People v. Farnam* (2002) 28 Cal.4th 107, 161-162 [crime scene reconstruction involves "examining the totality of the physical evidence"; expert's testimony about the sequence and location of crimes based on physical evidence including blood stains and bodily fluids was admissible].) The Haag treatise on shooting incident reconstruction, referenced in the trial court, contemplates a much narrower analysis. The treatise, as excerpted in defendant's reply to the prosecution's motion in limine, states that "a degree in one of the physical sciences is desirable but not necessary." The treatise adds, "An individual who is both firearms knowledgeable and interested in firearms is a requirement."

11

(*Chapman v. California* (1967) 368 U.S. 18, 24; *People v. Cunningham* (2001) 25 Cal.4th 926, 998 [the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, but the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right].)

Here, Krell's proposed testimony was intended to show that the shooter targeted Wilder for personal reasons, rather than gang-related ones. The defense believed evidence that the shooter stood directly over Wilder as he lay on the ground and fired the fatal shot supported this theory. Even assuming the shooter's position could show a personal motive, there was no other substantial evidence to support the theory that Wilder was targeted for personal reasons. The fact that Wilder's vehicle was registered to someone else is not suspicious. Jackson testified that Wilder was having difficulties at work, but described them as minor. She described the other employee as a "large" man while the shooter was a "small" man. Jackson and Flores both denied stating that they believed Wilder was being followed.

In any event, the shooter's act of standing over Wilder and firing at him was as consistent with a gang motive as with a personal motive. Defendant believes that Wilder was not a likely target for a gang retaliation murder because he was black and middle-aged, and the 18th Street gang was almost entirely Hispanic and young. He further believes that the shooter must have realized Wilder's age and ethnicity when he stood over him. We do not find the argument persuasive. The street was dark, and the shooter may not have been able to tell Flores and Wilder apart, or the shooter may not have been able to tell Wilder's race. In addition, Flores ran and Wilder did not, and the shooter may simply have decided to kill the more accessible victim. Thus, there is no reasonable probability or possibility that defendant would have received a more favorable outcome if Krell's testimony had been admitted.

B.      *Defense Expert Witness – Vehicle Identification*

Defendant also sought to have Krell testify about his enhancements to surveillance video still photos and his comparison of the vehicle in the enhanced images to stock

12

photos and specifications for an Infiniti G35 coupe and an Infiniti FX SUV. Defendant contends the trial court abused its discretion in finding that Krell was not qualified as an expert in either area.

### 1. Ruling

The trial court ruled it would not allow Dr. Krell to testify as to the type of vehicle used in the crime for the following reasons:

"First and foremost, such testimony lies outside his area of expertise. Dr. Krell readily admitted that he's an expert in the field of mathematics, not car recognition. Dr. Krell indicated that he used a computer program. That computer program would be termed AMPED, A-M-P-E-D, and in supporting such proffered testimony, Dr. Krell indicated it was the first time he had ever used this computer program with respect to discerning one vehicle from another, and this court was not satisfied at all with respect to his familiarity with the program, how it processes data, anything that would justify him being able to simply offer unsupported positions based on a computer program that was not fully explained.

"When the court inquired of Dr. Krell as to whether features such as ground clearance between the vehicle that the defense is asserting was likely to have been used as opposed to one the prosecution has used, these are fundamental, basic questions that any expert in the field of vehicle comparison is going to be very familiar with. Dr. Krell had absolutely no knowledge of these basic components.

"And lastly, the court was not satisfied with his inability to explain why his assertion that the vehicle was likely an Infinity G35 as opposed to an Infinity FX35, when the supposed corrected image was markedly different from the image of the G35 contained in what has been marked Defense A."

The court further ruled: "With respect to the proffered testimony as to the window tint of the suspect vehicle, again, Dr. Krell possesses absolutely no expertise in this area. When the court asked him to explain what his opinion was based on, it became clear that

13

he simply eyeballed the picture in the documents and did nothing more than what is properly to be left in the hands of the jury to determine.

"When questioned in this area he started talking about, well, he could count the pixels, but what the court finds very disturbing is his willingness to come into court, represent himself as an expert in this area, ready to render an opinion, having not done the basic homework that an expert is expected to do, for him to tell this court that he was going to count pixels only when his opinion was challenged by the court and counsel, again, I find very troubling.

"The court, in exercising its discretion under Evidence Code section 402 finds that Dr. Krell's proffered testimony is inadequate and without foundation within the language of 402, the preliminary fact as it pertains to the proffered testimony is as the court has stated, completely lacking and insufficient and beyond his expertise as a mathematician."

### 2.    *Analysis*

There is no doubt that Krell lacked any expertise in vehicle recognition or identification. He relied on specifications and photographs taken from Infiniti's website. Krell's primary value to the defense in this area was his enhancement of the still photographs from the surveillance videos. Thus, defendant's claims of error focus on the finding that Krell was not qualified as an expert on image enhancement. We hold the record demonstrates the trial court did not abuse its discretion in finding that Krell was not qualified as an expert in the AMPED software.

Krell testified that he had used the AMPED program before, but did not testify that he had received any training in the program or had any certifications in its use. He also did not claim that he had ever testified about AMPED-enhanced photos before or qualified as an expert in the use of AMPED. Krell did testify that he had built a lot of video analysis systems that included corrections for distortions from lens angles. He

14

gave no further details on those systems or if they were somehow related to or used AMPED.[5]

Further, Krell's testimony indicated some lack of familiarity with the output and capabilities of the AMPED program. During the 402 hearing, the trial court looked at slide 34, which contains two photos: a stock photo of an Infiniti G35 and an image of a vehicle from the surveillance cameras at the beauty shop. The court remarked that from a lay person's perspective, the rear part of the side window seemed to be markedly different in the two images. Krell replied, "I believe that's a reflection of the angle of the camera relative to the vehicle, because things get distorted." As the prosecutor later brought out on cross-examination, the surveillance video image on slide 34 was in fact a corrected image, as shown on slide 31. Krell later acknowledged that because the front of the side window was so dark, the program could not correct the elongation of the window as a whole. Krell explained this was why he focused on the back of the car. It is not obvious, and Krell did not explain, how the side window elongation could not be corrected due to missing data, but the rear shape of the car could be.

The trial court did not make a specific finding about Krell's expertise in edge detection in video images. Krell testified that he used "additional software from a very well-known, easily commercially available software program to do what's called edge detection," specifically Adobe Photoshop. Krell only used the edge detection with the AMPED enhanced images, however, and those images were not admissible. Thus, Krell's qualifications to further enhance those images with Photoshop was not relevant.

It is not clear whether the defense intended to have Krell testify as an expert specifically about vehicle window tint, as opposed to considering that part of his image enhancement expertise. The court, however, elected to treat it as a separate area of

---

[5] Krell's resume indicates that the video systems he developed were "automated target acquisition from infrared video[;] processing x-ray videos for heart defects[;] reticle defects analysis for computer chip manufacturing[; and] electrophysiology station for monitoring EKG, EEG, [and] Xray video." Impressive as these credentials are, they do not demonstrate an expertise in the AMPED software. None of these systems appear to involve processing images remotely comparable to video surveillance cameras.

15

expertise. Krell noted in slide 35 that Plain's Infiniti had an untinted driver's side window, but the driver's side window of the vehicle in the surveillance videos was not untinted (that is, it was tinted). When questioned by defense counsel about the tint of the windows, Krell testified that the driver's side window of the surveillance video vehicle "certainly looks black to me." The court then stated, "I can look at it with my naked eye and make a discernment. Obviously, as an expert, you better be doing better than that. Tell me how." Krell replied, "Actually, I could. I did not in this case, but I could look at the raw pixels in there and see the level of the pixels, whether the pixel values were black or white, or whatever. I did not do that in this case." The trial court therefore did not abuse its discretion in finding that Krell was not offering expert testimony.

### C. *Prosecution Expert Witness – Vehicle Identification*

Defendant contends the trial court erred in permitting the prosecution to call Stephen Ferrara as an expert witness on Infiniti vehicles. He contends the court had previously determined that a comparison of Plain's Infiniti with the vehicle in the surveillance videos was not a proper subject for expert testimony. The trial court did not abuse its discretion in permitting expert testimony by Ferrara.[6]

Defendant's contention that the court had previously determined vehicle comparison was not a topic for expert testimony is based on the court's explanation that it was excluding Krell's comparison of the vehicles because "it became clear that he simply eyeballed the picture in the documents and did nothing more than what is properly to be left in the hands of the jury to determine." In fact, the trial court was referring to Krell's comparison of the window tints in the two vehicles, and prefaced its comment with the finding that "Dr. Krell possesses absolutely no expertise in this area." Thus, the trial court was not saying that vehicle comparison was not a proper subject for expert

---

[6]     Respondent contends defendant forfeited this claim by failing to "press for a ruling" on his objection that if Krell's testimony were excluded, Ferrera's testimony should be excluded as well. The trial court did rule on this objection. The court stated that if someone had the training and experience to opine on vehicle types, "I don't know on what basis I would rightfully exclude it." Defendant was not required to do more.

16

testimony, the court was saying that Krell was not an expert in this topic and so could do nothing more the jurors in comparing the vehicles.

Ferrara possessed the expert knowledge of Infiniti vehicles that Krell lacked. Ferrara was the general manager of an Infiniti dealership owned by Auto Nation. He had worked there for a year and a half. Thus, Ferrara's knowledge derived from working with Infiniti vehicles, unlike Krell's knowledge which came from viewing a website.

Ferrara was clearly qualified to opine on whether a particular vehicle was an Infiniti. In the record before us on appeal, such identifications comprised the bulk of Ferrara's testimony. Based on the reporter's transcript of Detective Funicello's testimony identifying Defense Exhibits W through II as still images from surveillance videos, Ferrara opined on direct examination that the vehicle in Defense Exhibits W, X, Y, and AA (beauty shop video) and the vehicle in Defense Exhibits HH and II (liquor store store video) was an Infiniti FX. He could not provide a precise model year, noting that the FX "didn't change very much from the time they came out until now."

On redirect examination, the prosecutor showed Ferrara a photo of Plain's vehicle. Ferrara identified the vehicle as an Infiniti FX SUV with a model year between 2004 and 2008. He testified that Plain's Infiniti had the distinctive "swoopy" windows that are characteristic of the FX models. He also opined that the vehicle in the beauty shop video still had the same distinct window feature. He did not opine that the vehicle in the video was Plain's vehicle.

Even assuming that an overall vehicle-to-vehicle comparison is not a proper subject for expert testimony, the only direct vehicle-to-vehicle comparison occurred during cross-examination by defense counsel, when Ferrara opined that the vehicle in Defense Exhibit DD (beauty shop video) looked like the same car as the vehicle in Defense Exhibit II (liquor store video). He acknowledged, however, that he could not tell if it was "the exact same vehicle." In fact, Ferrara acknowledged that he could not tell if the vehicle in the liquor store video was silver or white.

17

### D.    Unequal Treatment

Defendant contends the trial court treated the proposed defense expert on vehicle identification differently than the prosecution expert on this subject.  Defendant argues this difference deprived him of his Fifth and Fourteenth Amendment right to due process and a fair trial.[7]

Disparate treatment in admission of defense and prosecution evidence can violate a defendant's right to due process and a fair trial.  (*People v. Cowan* (2010) 50 Cal.4th 401, 474, citing *Wardius v. Oregon* (1973) 412 U.S. 470, 476.)

As we explain above, the court properly excluded Krell's testimony on vehicle comparison and properly admitted Ferrara's testimony on vehicle identification.  Thus, the court did not favor the prosecution over the defense.

To the extent that defendant contends that the court improperly took an "adversarial" tone with Krell during the 402 hearing but an "overly gracious" tone with Ferrara, we do not find any differences significant.  There are some indications in the record that the trial court may not have been pleased that the defense was presenting a witness who the court believed was not qualified.  The jury was not present during the hearing, however, and there is nothing to suggest that the court's tone arose from animosity towards the defense.  The trial court was not "overly gracious" with Ferrara.  The court did question Ferrara in an attempt to clarify the basis for Ferrara's identification of the vehicles in the videos as Infiniti FX's, but these questions had the potential to hurt the prosecution as much as help it.  In fact, Ferrara was able to point to only one "distinctive" feature of the Infiniti FX.

---

[7]    Respondent contends defendant has forfeited his claim of "judicial bias" by failing to object on this ground in the trial court.  We do not understand defendant's claim to be one of general or overall judicial bias.  Defendant points to a specific instance of what he claims is disparate treatment, which involves experts on a key issue, vehicle identification.  Defendant did object that if his expert Krell were disqualified, the prosecution's expert on a similar topic should also be disqualified.  Under the circumstances, this is sufficient to preserve defendant's specific claim of disparate treatment.

*E. Instructional Error – Natural and Probable Consequences Doctrine*

Defendant contends, and respondent agrees, that the trial court erred in giving the full version of CALCRIM No. 400 on aiding and abetting, which includes a paragraph describing the natural and probable consequences doctrine. Defendant contends the prosecution relied on that doctrine, and that the paragraph of the instruction permitted the jury to convict him of Wilder's murder without finding that Wilder's murder was a foreseeable consequence of the attempted murder of Flores.

*1. Instruction*

The court instructed the jury with the full version of CALCRIM No. 400 on general principles of liability for a crime, including the last bracketed paragraph. That instruction provides:

"A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime."

"A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.

"[Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.]"

The Bench Notes for the instruction state that the bracketed language is to be given if the prosecution is relying on the natural and probable consequences doctrine. (Bench Notes to CALCRIM No. 400 (2011) p. 167.) In addition, CALCRIM Nos. 402 or 403 explaining the natural and probable consequences should be given.

*2. Law*

Giving the bracketed portion of CALCRIM no. 400 without also giving CALCRIM Nos. 402 and 403 is error. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1433.) The bracketed language is "superfluous and, without clarification through

19

CALCRIM No. 403, meaningless." (*Ibid.*) Any error in giving the bracketed language, is harmless, however, if the prosecution does not rely on the natural and probable consequences theory to prove the defendant's guilt. (*Id.* at p.1434.) "Our Supreme Court has observed that when the parties make 'no reference to the 'natural and probable consequences' doctrine in their arguments to the jury, it is highly unlikely that the jury [will have] relied upon that rule . . . .' (*People v. Prettyman* (1996) 14 Cal.4th 248, 273.)" (*People v. Rivas*, *supra*, 214 Cal.App.4th at p. 1432.)

### 3. *Analysis*

Defendant contends the prosecutor obliquely referred to the natural and probable consequences doctrine in two different ways during closing argument, and so the misinstruction with CALCRIM No. 400 was not harmless. We place the prosecutor's statements in context below, and find no merit to defendant's argument. Thus, the instructional error was harmless. (*People v. Rivas*, *supra*, 214 Cal.App.4th at pp. 1432-1433.)

### a. *"collateral damage" argument*

Defendant contends the prosecutor's argument that Wilder was "collateral damage" meant that defendant was responsible for his killing only if it was a natural and probable consequence of the attempted murder of Flores. Defendant notes that the prosecutor later argued Wilder was not the target of the killing, further hinting at the natural and probable consequences theory. Considered in context, defendant's interpretation of the collateral damage reference is not a reasonable one.

The prosecutor argued: "When the defendant acted he had a state of mind called malice aforethought . . . . Express malice means he intended to kill. This was something that was set out. How do we know it was set out? The car was circling . . . . Hunting for his prey. That is what the defendant was doing. [¶] He was looking for that male Hispanic, because it's not like gang members actually ask questions and show me your tats and let me figure this out. Mr. Wilder, I submit to you, was collateral damage.

20

*Collateral damages, wrong place, wrong time . . . .* [¶]  And Mauricio Flores, he's not a gang member.  He, too is an innocent victim of the defendant's, again, cowardice, unnecessary, random act of street violence . . . ."

The prosecutor's argument was that defendant was looking for a gang member to kill but instead found Wilder and Flores, who were not gang members, but who happened to be outside in an area where defendant was looking for someone to kill, and one of whom was Hispanic.  Nothing in this argument suggests that defendant was responsible for Wilder's death because it was a foreseeable consequence of an attempt to kill Flores.

In rebuttal, the prosecutor stated, "And somehow Mr. Wilder was the intended target."  As defendant acknowledged, this was a response to the defense theory that the shooter had a personal motive to kill Wilder and that Wilder was the target of the killing, not Flores.  It cannot be reasonably be understood as an oblique reference to the natural and probable consequences theory.

### b. foreseeability argument

Defendant contends the prosecutor argued (1) defendant's subjective state of mind with respect to the killing of Wilder was irrelevant and liability attached because his death was an unintended but reasonably foreseeable consequence of the attempted murder of Flores and (2) the prosecutor misstated the law by saying that it did not matter whether the shooting of Wilder was a foreseeable consequence of the intentional killing of Flores.  He views both arguments as referring to the natural and probable consequences doctrine.

The prosecutor argued, "I'm about to explain aiding and [abetting] to you.  [¶] Some of you may be sitting here thinking, well, I know he was there, I know he drove there, but I'm not sure if he was the one who shot or just drove . . . . You don't all have to agree as to whether or not he was the shooter or the driver.  All you have to agree to is was he there and did he play any role by using the car.  [¶] . . . [¶]

21

"So if you think to yourself *that the defendant wasn't the shooter, but he was definitely there and it was definitely his car, that's good enough. That is good enough under our law.*

"So why is this law and why is it fair? . . . [W]e know from the defendant and his sergeant stripes that he sees himself as a high ranking member. He's someone who gives the orders, doesn't necessarily carry them out himself, but needs to make sure that the work gets done. [¶] You're more likely to engage and be successful if others are there to encourage the conduct and others help accomplish the conduct.

"That's why we have the aiding and abetting, because if someone is working with you and encouraging you and helping you in some way, because it's difficult to drive a car and shoot at the same time, it makes sense.

"Like I said, he may be guilty in one of two ways. You either think that he committed the crime by being the shooter, or that he helped somebody else, but *as long as you all agree that he was there and that it was Ms. Plain's car, the defendant is guilty.*

"So you'll have this instruction that if you think that he wasn't the shooter, if the shooter committed the crime, that he knew the shooter was going to do the crime, and before or during the crime, he intended to aid and abet the shooter, well, obviously, that's what was going on . . . [¶] And this, again, he aided. It was his car . . . He was the one with the motive. He was the one who had every reason to be doing what he did."

Nothing in these remarks refers to foreseeability in any way. Nothing in this argument suggests that defendant only intended to aid and abet the killing of Flores. The prosecutor's full argument told the jury that if defendant was not the actual shooter, he needed to know of and share the actual shooter's intent, and to provide some assistance or encouragement to the actual shooter. The prosecutor contended that defendant's act of driving the car was such assistance. This argument expressly tells the jury that defendant's mental state *did* matter. It cannot be reasonably understood as a reference to the natural and probable consequences doctrine, or as misstatement of that doctrine or the law.

22

### F.     Prosecutorial Misconduct

Defendant contends the prosecutor committed misconduct by arguing there was no evidence to support a finding that Wilder was shot while laying on the ground and also by making numerous appeals to passion and prejudice, including asking the jury to consider the emotional impact of the crime on the victim's family and telling the jurors they had a civic duty to convict.

#### 1.     Forfeiture

Defendant did not object to the prosecutor's remarks or request an admonition. He has not shown that such efforts would have been futile or ineffective. Accordingly, he has forfeited this claim. (*People v. Gray* (2005) 37 Cal.4th 168, 217; *People v. Arias* (1996) 13 Cal.4th 92, 159 [noting exceptions to forfeiture rule where objections would have been futile or admonishments ineffective].) Defendant urges us to adopt the federal practice of conducting a "plain error" review when no objection is made. As defendant acknowledges, the California Supreme Court has previously declined such requests. (See *People v. Redd* (2010) 48 Cal.4th 691, 731, fn. 19, and cases cited therein.) We are bound by that decision.

#### 2.     Ineffective assistance of counsel

Defendant contends that if his claim is forfeited for his attorney's failure to object, his attorney was constitutionally ineffective.

"In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.)" (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.) We presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of

23

sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel." (*Ibid*.)

If the appellate record "sheds no light on why counsel acted or failed to act . . ." as the defendant claims he should have, a reviewing court on direct appeal must reject an ineffective assistance of counsel claim "unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. Otherwise, the claim is more appropriately raised in . . ." a habeas petition. (*People v. Carter*, *supra*, 36 Cal.4th at p. 1189, citation omitted [rejecting claim on direct appeal that counsel should have presented defense witnesses]; *In re Arturo A*. (1992) 8 Cal.App.4th 229, 243 [because counsel's reasons are "typically . . . not reflected in the record," habeas is the "preferred review procedure" for ineffective claims].)

Here, counsel was not asked for an explanation. There are potentially satisfactory reasons for counsel's failure to object. Accordingly, defendant's claims of ineffective assistance of counsel fail.


### a. argument concerning excluded evidence

It is misconduct for a prosecutor to tell the jury there is no evidence to support a defense point if the prosecutor knows such evidence exists and previously obtained its exclusion. (*People v. Varona* (1983) 143 Cal.App.3d 566, 568-570.)

Defendant contends the following argument by the prosecutor constitutes such misconduct: "There is no evidence that Mr. Wilder was shot while laying down on the ground . . . . [T]o say that he had to be lying down when he was shot in the back, where is the evidence of that? . . . He could have been falling. He could have been turning to run." Defendant contends the prosecutor had successfully moved to have such evidence excluded.

Any objection by defense counsel to this argument would have been without merit. The prosecutor did not move to have evidence of Wilder's body position excluded; she moved to exclude Krell's proposed shooting incident reconstruction testimony. The prosecutor sought to exclude this evidence precisely *because* she

24

believed that there was no evidence from percipient witnesses of Wilder's position when he was shot. As Krell acknowledged, a bullet's trajectory cannot be determined from the wound path alone; Krell's opinion relied on Flores's pretrial statements and testimony concerning Wilder's position. "[A d]efense counsel is not required to advance unmeritorious arguments on [a] defendant's behalf." (*People v. McPeters* (1992) 2 Cal.4th 1148, 1173; see also *People v. Grant* (1988) 45 Cal.3d 829, 864-865 [to prevail on ineffectiveness claim based on counsel's failure to make a motion, defendant must show that such motion would have been successful].)

### b. appeals to passion and prejudice

It is improper for a prosecutor to argue that the jury in a non-capital case should consider the impact of the crime on the victim's family. (See, e.g., *People v. Jackson* (2009) 45 Cal.4th 662, 691-692.) Similarly, an appeal for sympathy for the victim is out of place during an objective determination of guilt. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250.)

Defendant contends that the prosecutor's gratuitous mention of Wilder's family, made in response to defendant's argument that the killer had been following Wilder, was the beginning of a "foray into the forbidden territory of victim impact evidence."

The prosecutor argued: "What there's really no evidence of is that Mr. Wilder was being followed or that Mr. Wilder was guarded and kept secrets, [] that's what that meant. [¶] *Mr. Wilder had a family. He had a wife and children. Mr. Wilder left his home with his wife*, didn't tell Mauricio that he was coming to get the car. [¶] So you're supposed to believe this logical fallacy that somebody just happened to be waiting outside at night at 9:30, outside the Wilder residence, just figuring that they were going to leave at some point, and then drove from the South Bay, just happened to know where they were going when nobody else knew, including Mauricio, and then at some point the car goes invisible, because you don't see it on the video, and then shoots Mr. Wilder, and that's it . . . [¶] . . . [¶] *And to say that he's guarded, that that means he has something to*

25

*hide. No, he didn't have something to hide. He had something to protect. His family. His family.*"

The italicized portions of the argument are not reasonably understood as victim impact evidence. The argument as a whole is responding to the defense claim that Mr. Wilder had something to hide, and his secrets were the reason he was killed. The prosecutor is in effect arguing that Mr. Wilder's family would not have been involved with picking up the car if he had secrets because he would not want to endanger them. An objection that the argument was victim impact evidence would have lacked merit. The failure to make such an objection does not show ineffective assistance of counsel. (See *People v. McPeters*, *supra*, 2 Cal.4th at p. 1173; see also *People v. Grant*, *supra*, 45 Cal.3d at pp. 864-865.)

Defendant contends the prosecutor next invited the jury to speculate about the emotional damage that might have occurred if Wilder's children had witnessed the shooting, and asked the jury to consider the case from Jackson's perspective.

The prosecutor argued: "Mr. Wilder's children, his son, almost witnessed this murder. You heard that from Ms. Wilder. He was going to go, but it was late, and even though she wasn't feeling well, she wanted the kids to stay home and do homework. So as horrible as it is that she had to watch her husband gunned down and a friend of theirs, Mauricio, shot at, you don't think that she gets up and thanks God every day that it was her and not them?

"And then to be told that somehow, and to sit here and have to listen over and over again that somehow she had something to hide, that her husband created this situation, that her husband was the victim? He was a victim alright. He was a victim of what that coward did when he rode up to a vehicle, some crazy gang retaliation that these two men—these two men had nothing to do with. Nothing at all. Absolutely nothing.

"And then she had to drive home that night and tell her children. And then sit in court and be told 'weren't you afraid someone was following you?' Who? What did Mr. Wilder ever do? What evidence did you ever hear that he deserved to suffer the indignity of dying on a dirty street?

"That man lived with dignity, he raised his family with dignity, and he deserved to die with dignity, and that man robbed him of that. That man. Because his cousin was shot."

The argument as a whole is a response to the defense theory that Wilder had something to hide and was the intended victim. But there are what might be seen as attempts to appeal for sympathy for the Wilders scattered throughout the argument. References to Wilder's children "almost" witnessing the crime, for example, are not relevant to any issue in this case. The remarks are not especially inflammatory, however, and they are unlikely to have stirred up much, if any, passion. An attorney could make a reasonable tactical decision not to object to these remarks to avoid drawing attention to them. "'[W]e accord great deference to counsel's tactical decisions' (*People v. Frye* (1998) 18 Cal.4th 894, 979), and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' (*People v. Scott* (1997) 15 Cal.4th 1188, 1212). 'Tactical errors are generally not deemed reversible, and counsel's decision making must be evaluated in the context of the available facts.' (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)" (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.)

### c.     civic duty

Defendant contends the prosecutor ended her closing argument by telling jurors they had a civic duty to convict.

The prosecutor argued: "This country has always been a beacon to the world for liberty and justice, but we're also a beacon for another type, for criminals and con men, and we rely on the laws to protect us from them. Is it enough? Do we need more laws? Less freedom? [¶] I don't think that's the answer. The answer is that each of us is responsible for the other and not one of us can afford to turn a blind eye. By respecting the laws that we do have and the oath that you took and living up to the true meaning of the word 'citizen,' we preserve our common good. [¶] By the defendant's actions, engaging in this continuing game of retaliation that cost the life of one innocent man and

27

almost took the life of another, he allowed a criminal enterprise to flourish and a cancer to grow. [¶] This is where it has to stop in this courtroom with you. Find the defendant guilty on all counts and true on all allegations. Thank you."

This is an oddly dramatic argument, one that appears to have been lifted at least in part from a legal television show.[8] Although concluding argument with this short soliloquy strikes us as a curious choice, we do not believe jurors understood it as an exhortation that they had a civic duty to convict defendant. Instead, the argument expressly told the jurors to "respect[] the laws that we do have and the oath that you took." Although defendant's attorney might have objected, the effect of the argument had no real prejudicial impact—the prosecutor did not, for example, misstate the evidence, vouch for witnesses, or imply there was additional evidence of guilt not presented at trial. Under the circumstances, an attorney could make a reasonable tactical decision to refrain from objecting, and such a decision is not grounds for reversal. (See *People v. Weaver*, *supra*, 26 Cal.4th at pp. 925-926.)

### G. Cumulative Error

Defendant contends that the cumulative errors at trial combined to create a miscarriage of justice requiring reversal of his conviction. We have rejected nearly all of defendant's contentions of error and have found any errors that were made to be harmless. Defendant's cumulative error claim therefore fails.

---

[8] Defendant's reply brief juxtaposes the prosecutor's argument in this case with an argument made by fictional prosecutor Jack McCoy on an episode of the Law and Order television show. The similarities are striking.

28

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



KRIEGLER, Acting P.J.



KUMAR, J.*

---

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

29